IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2011 Session

**STATE OF TENNESSEE v. TERRY NEAL**

**Appeal from the Putnam County Criminal Court**
**No. 09-0728      David A. Patterson, Judge**

---

**No. M2011-00824-CCA-R3-CD - Filed July 31, 2012**

---

After a trial by jury, the defendant was found guilty of four counts of rape, Class B felonies, and three counts of sexual battery by an authority figure, Class C felonies. The defendant was sentenced to a total effective sentence of twenty years. On appeal, the defendant claims that the evidence is insufficient to support his convictions, that the prosecution committed misconduct during closing argument, and that the trial court erred by ordering him to serve his sentence on a single rape count consecutive to his remaining concurrent sentences. After carefully reviewing the record and the arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROBERT W. WEDEMEYER, J.J., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Terry Neal.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall A. York, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

The defendant was indicted on August 10, 2009, on six counts of rape, Class B felonies, in violation of Tennessee Code Annotated section 39-13-503, and four counts of sexual battery by an authority figure, Class C felonies, in violation of Tennessee Code Annotated 39-13-527. At the defendant's trial on August 9-10, 2010, the following evidence

was presented:

The victim took the stand and testified that she was currently fifteen years old and that she had been born on June 19, 1995. She testified that she had two younger half-sisters. She testified the defendant was her mother's ex-husband and that she had called him "dad" after the two were married.

The victim testified that at some point after they moved into a new house, the defendant "doctored" her in her private area by rubbing her with a white medication. She testified that she had not asked the defendant to do this and that she was upset by it. She testified that the defendant touched her private for several minutes while he was "doctoring" her. She testified that she did not have a rash when he did so.

The victim testified that at some point after this incident occurred, while she was in one of her sister's bedrooms, the defendant lay down on the floor and stuck his tongue into her vagina. She testified that he continued to do this for several minutes. She testified that she did not want the defendant to stick his tongue inside her but that she did not tell her mother about the incident.

The victim testified that on another occasion, she was alone with the defendant in the defendant's bedroom while she was having her period. She testified that the defendant lay down on his bed and made her touch his penis. She testified that after she did so he put his penis inside her vagina. She testified that because she was bleeding, the defendant stopped to get a towel and put it underneath her, so that her blood would not get on the bed. She testified that after he finished he washed the covers to get the blood off. She testified that the defendant had his penis inside her vagina for several minutes both before and after he stopped to get the towel. She testified that she did not want him to put his penis inside her but that she did not ask him to stop or scream for help. She testified that there was no one else at home to respond even if she had screamed. She also testified that she was scared of the defendant, and had always been scared of him.

The victim testified that on another occasion, in her bedroom, she was on one side of her bed and the defendant started touching her "as usual." She testified that he made her touch his penis, and afterward the defendant began masturbating. She testified that the defendant came while he was masturbating and that some of his "white stuff" dripped out on the floor. She testified that the defendant fetched a towel and wiped it up.

She testified that on a different occasion in her bedroom, she was on the other side of her bed and the defendant was again touching her vagina. On this occasion, she testified that the defendant put his penis inside her vagina for a couple of minutes. She testified that she

did not scream for help because her mother was gone.

She testified that there was a third incident in her bedroom that occurred on another occasion when she was at the base of her bed. She testified that on this occasion the defendant touched her and also put his penis inside her vagina. She testified that he ejaculated on this occasion. She testified that she did not tell anyone about these encounters because she was scared of the defendant, who was a "big guy." She testified that the defendant was not her boyfriend, that she did not like him touching her, and that she wanted for him to stop. She testified that he held her down on several occasions.

Following the encounter at the base of her bed, the victim testified that the defendant became concerned that she might be pregnant because her period was late. The victim testified that the defendant gave her a pregnancy test. The defendant told her to tell her mother that she had been outside of the house when someone had come up behind her and raped her if the test revealed that she was pregnant. The victim testified that the defendant made her urinate on the pregnancy test. She testified that she accidentally dropped the test into the toilet when she finished, and the defendant responded by hitting her across the face. She testified the defendant told her he was going to go get another test, and did so. She testified that she also urinated on the second pregnancy test, and the test came back negative.

She testified that after she finished the second test the defendant took her outside with him, put the pregnancy test in the pan, and lit it on fire. Afterward, the victim testified that the defendant took a shovel and buried the pregnancy test under the unfinished floor of a tack room inside an out-building on the family's premises. She testified that he did not explain why he buried the pregnancy test.

The victim testified that, sometime later, she told her mother that the defendant had touched her. However, when she was left alone with the defendant a short time later, he told her to tell her mother that she was not telling the truth. She testified that she recanted her story. She testified that, a few months later, she again told her mother the truth. She testified that after she reported the incidents the second time she underwent a rape examination at the Child Advocacy Center.

On cross-examination, the victim acknowledged that when her mother first met the defendant she wanted for the defendant to adopt her. She also testified that the defendant was a disciplinarian, whereas her mother was "pretty laid-back." She testified that when the family moved into their new house, the defendant had made a "deal" with the girls that if they would help out doing some chores around the house, he and their mother would buy them a swimming pool. She testified that she and her sisters kept their end of this "bargain," but after the defendant lost his job, she was informed that the family could no longer afford

a swimming pool. She testified that she and her sisters were upset when they learned that they were not going to get the pool.

The victim testified that she had numerous opportunities to tell school counselors and other individuals about the abuse but that she did not do so. The victim also testified that the defendant woke up one morning and saw her and her boyfriend together on the sofa, and accused them of doing something inappropriate. The victim testified that she was angry at the defendant for trying to keep her from having a relationship with her boyfriend.

The victim testified that she was unsure what had happened to the first pregnancy test but that she thought that the defendant had thrown it away in the trash can. The victim testified that the defendant never touched her again after the day on which she first told her mother that the defendant had touched her. She also testified that even though her mother did most of the laundry in the house, she did not believe that her mother would have noticed if the sheets on one of their beds had been changed, washed, or cleaned up. She testified after she initially reported the abuse, she never said, and she never heard any of her sisters say, that they still loved the defendant.

Prior to the victim's testimony, the victim's mother took the stand and testified that she had been married to the defendant. She testified that she moved in with the defendant – into his residence in Putnam County – during Thanksgiving of 2002. She testified that she had three children, the oldest of which – the victim – was born in 1995. She testified that after she moved in with the defendant, the defendant became like a father figure to the victim, whose biological father was not in the picture. The victim's mother testified that the defendant cared for and disciplined the children and gave them advice. She testified that she married the defendant in September of 2004, and they divorced in 2008. The defendant's ex-wife testified that during the time period at issue she worked at a linen service from 7 a.m. to 3 p.m. and that the defendant watched the children during this time period.

The defendant's ex-wife testified that the defendant had identifying marks on his body – and more specifically, he had stretch marks on his hips and belly from where he had gained and then lost weight. The defendant's ex-wife testified that the house where she had lived with the defendant had an out-building on the property. This out-building had several stalls meant to contain horses as well as a "tack room." The defendant's ex-wife testified that when she first moved into the new house, the floor of the "tack room" was only partially finished, and the defendant later finished it. The defendant's ex-wife testified that in the new house each of her children, including the victim, had their own bedroom at the opposite end of their residence from the marital bedroom. The defendant's ex-wife testified that she and the defendant had sexual relations in the living room and in the marital bedroom, but they never had sex in the victim's bedroom.

-4-

The defendant's ex-wife testified that after the victim started menstruating, the defendant appeared to become overly concerned with her development. She testified that on one occasion, when the victim was thirteen years old, the defendant applied medicine (Desitin) to the victim's vaginal area. The defendant's ex-wife testified that she told the defendant that applying medicine in that manner was a "mother thing to do," and she stated that he agreed.

The defendant's ex-wife testified that at one point she and the defendant promised the children to install a swimming pool, but they later discovered they could not afford to do so. The defendant's ex-wife testified that the victim did not "go wild" or act out when she was informed that they were no longer going to receive a pool.

On cross-examination, the defendant's ex-wife stated that the defendant lost his job with FedEx because of a speeding ticket. He eventually started working for FedEx again at some point in 2007. She testified that she would usually be home from work by the time the girls returned home from school, but the defendant was alone with the children at various points, such as when she went to the store.

She testified that her children had been in her life every day and there had never been a point during which she could not talk to them. She testified that the victim first reported her sexual abuse at the hands of the defendant in April or May of 2008. She testified that when she first learned of the abuse, she became extremely upset, but the victim later told her that she had not been molested by the defendant. She testified that she believed the victim when she recanted. She testified that the victim repeated her allegations on July 14, 2008, at which point she got an order of protection against the defendant and he moved out of the residence.

The defendant's ex-wife denied that she and the defendant had "christened" all of the rooms of the new house when they had first moved in and denied that she had ever told anyone otherwise. She testified that the defendant had told her that he had caught the victim and a slightly older boy together on the family's couch and that he had disciplined the victim for it. She testified that, because of their separate work schedules, the defendant usually slept on the family sofa. She testified that the house was small enough that she would have been able to hear if anyone had called out at night.

She testified that her middle daughter had some anger issues and that at one point she and the defendant had discussed enrolling her in anger management classes. She testified that none of her girls had ever told her that they loved the defendant or would miss him since the incidents. She testified that she could not recall sending the defendant an email message on New Year's Eve of 2008, stating that she still had feelings for him, wishing him luck, and

stating that she did not believe the allegations that had been made by her girls.

On re-direct examination, the witness clarified that during the relevant time period she worked from 7 a.m. to 3 p.m. and that the defendant was unemployed. She also testified that she had to work on holidays and that the defendant was home alone with the girls all day during those time periods. The witness clarified that, when the victim recounted her initial story, she did so after she had just been left alone with the defendant for a period of two or three minutes. She testified that she currently believed her daughter's allegations and felt horrible that she had doubted them initially.

Following the victim's testimony, one of the victim's little sisters took the stand. The victim's sister testified that she was currently thirteen years old and that she had been born in 1996. She testified that on one occasion, she heard a conversation between the defendant and the victim concerning a pregnancy test. She testified that she heard the defendant ask the victim "why did you drop that in the toilet." She testified that she also heard the defendant say that he was going to get a new pregnancy test from the store. She testified that she heard the defendant say that if the victim did it again, he was going to hit her with a paddle or belt. She testified that the defendant left shortly afterwards.

On cross-examination, the victim's sister testified that this incident occurred early in the day, because her mother was at work. She testified that she and her sisters were at home that day because they were off from school for either President's Day or a teacher's work day. She testified that it was warm outside on the day that she overheard the conversation.

The victim's sister also testified that the defendant promised them that if they helped him around the house, he would buy them a swimming pool. However, she testified that she did not care that the promised swimming pool was never delivered. She also denied giving a statement to police in which she told the officers that her sister did not refer to the incidents that had occurred as rape. She agreed that she had previously stated in a tape-recorded interview that she had once wanted for the defendant to adopt her.

In addition to this testimony, the State presented the testimony of: Ms. Cindy Groll, a school social worker for the Metro Nashville Public School System, who testified that she met with the victim on July 24, 2008, at the Cookeville Child Advocacy Center, and that at this meeting, the victim told her that the defendant had sex with her, kissed her private, and made her undergo two pregnancy tests; Mr. James Patterson, a Criminal Investigator with the Putnam County Sheriff's Department, who testified that he investigated the case starting on July 14, 2008, that he discovered a burned pregnancy test underneath the floor of the tack room at the defendant's residence as well as a pan in that same room, and that he had pulled the carpet out of the victim's bedroom and sent it to the Tennessee Bureau of Investigation

Crime Lab in Nashville for DNA testing; Mr. Brad Everett, an analyst with the Tennessee Bureau of Investigation in Nashville, who testified that he analyzed the carpet taken from the victim's bedroom and found sperm present in three separate locations, that the DNA found in all three spots matched the defendant, and that the victim's DNA was also found in one of the spots; and Ms. Hollye Gallion, a nurse at a medical clinic specializing in sexual abuse who was qualified as an expert in the area of child sexual abuse, who testified that she had examined the victim following the reported abuse and that the victim's hymen was not torn, but that, contrary to popular belief, sexual activity and sexual abuse rarely causes tearing to the victim's hymen and that some women still possess a hymen even after childbirth.

After presenting this testimony, the State rested. At the close of its case, the State dropped two of the rape counts and one of the counts of sexual battery by an authority figure on the grounds that they were not supported by the evidence, and proceeded on the remaining counts.

The defendant's mother took the stand in his defense. She testified that the defendant had a wonderful relationship with the victim, her mother, and her sisters. She also testified that the victim's mother told her during a phone conversation shortly before they moved in to the new home that, while she and the defendant had been cleaning and preparing the new home, they had "christened" each room of the new house except the bathroom. Mr. Mike Kilgore, one of the defendant's friends, also took the stand and testified that he attended a cookout with the defendant shortly after the family moved into their new home and that the defendant had told him at this cookout that he and the victim's mother had "christened" each room of their new house.

Afterward, the defendant took the stand in his own defense. He testified that he fell in love with the victim's mother and that he had a good, "heartful" relationship with her children. He testified that the victim's mother asked him to discipline the children because she felt he was better at it than she was. He testified that he had sex with the victim's mother in every room of their new home, including all four of the bedrooms, on multiple occasions.

He testified that he once administered Desitin to the victim's vaginal area at the victim's request after the victim had come to him complaining of a rash, and explained that he did so because he was playing "Mr. Mom." He said the victim approached him again some time later and asked that he do so again, but he claimed that he declined, explaining to her that "it doesn't look good."

He testified that at one point the victim's mother approached him and the victim while they were outside near the barn, asked them to come inside, and confronted him about touching the victim. He testified that he denied touching the victim to the victim's mother.

He testified that one of the victim's sisters told the victim's mother that the victim was making it all up and that the victim's mother kept asking the victim concerning the abuse until she was satisfied that it had not occurred.

He testified that some time after this incident, his relationship with the girls changed, and they would no longer sit in his lap. He testified that a short time before the victim repeated her allegations, he caught the victim on the sofa with a slightly older boy, with the boy "laying on top" of the victim. He testified that he separated them, and the victim got angry at him for doing so.

The defendant testified that he had never touched the victim's vagina with his tongue, never asked her to stroke his penis, and never had sex with her. He testified that the victim's mother always did the laundry in the house and that the victim's mother would have known if he had ever messed up the sheets because he was not good at laundry. He testified that he had never ejaculated in the victim's bedroom without his wife being present.

He testified that he saw the victim's mother on several occasions after she obtained a protective order in the wake of the victim's second allegation. He testified that during mid-October following the allegations, he spent the night with the victim's mother at a motel and had sex with her. He testified that on the following New Year's Eve, he received an e-mail from the victim's mother wishing him a Merry Christmas and a Happy New Year.

On cross-examination, the defendant testified that he was alone with the girls on occasion, and that there were occasions when he was alone with the victim for "an hour or two." He testified that he never asked his wife any questions about the victim's period, and that any and all discussion of the victim's menstrual cycle was started by his wife. He testified that he had the ability to throw sheets in the washer and wash them before his wife got home. He testified that when they were first moving into the new house, he and his wife had sex in six different rooms in a single day, that he ejaculated all six times, and that they spent three to five hours engaged in this activity. He testified that they had sex in the victim's bedroom two or three times over various days.

He testified that he was not angry at the victim and her boyfriend for lying together on the sofa because he was jealous of the victim's boyfriend. He testified that he put down the new floor in the tack room before he caught the victim with her new boyfriend, and he agreed that whoever buried the pregnancy test there would have had to have done so before he laid down the new floor.

Following the defendant's testimony, the defense rested, the jury was charged, and the parties made closing arguments. The jury retired to deliberate at 2:31 p.m. on August 10,

2010, and returned at 3:44 p.m. that same day with a verdict finding the defendant guilty of all remaining counts – four counts of rape and three counts of sexual battery by an authority figure.

On October 26, 2010, the trial court sentenced the defendant to ten years on each of the four rape convictions and to three years on each of the counts of sexual battery by an authority figure. The judge ordered all of these sentences to be served concurrently, except for the second rape conviction, which he ordered to be served consecutively to the remaining counts, thereby giving the defendant an effective sentence of twenty years. The defendant filed a timely motion for new trial, which was denied by the trial court.

The defendant filed a timely notice of appeal on January 28, 2011. We have reviewed the record and the arguments of the parties. Our decision follows.

## ANALYSIS

The defendant claims that the evidence is insufficient to support his convictions, that the prosecution committed misconduct in its closing argument, and that the trial court erred by ordering him to serve his sentence on one of his rape counts consecutive to the remaining concurrent sentences, resulting in an effective sentence of twenty years. For the reasons that follow, we reject each of these claims.

### I.

The defendant claims that the evidence is insufficient to support his convictions. The relevant standards and governing laws concerning challenges to the sufficiency of the evidence were recently and succinctly summarized by our supreme court in *State v. Cross*, 362 S.W.3d 512, 523 (Tenn. 2012):

> When evaluating a challenge to a conviction based upon the sufficiency of the evidence, "we must determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); *see also* Tenn. R. App. P. 13(e); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). A verdict of guilty removes the presumption of innocence to which a defendant had formerly been entitled replacing it with a presumption of guilt; accordingly, the defendant bears the burden of demonstrating the insufficiency of the evidence to sustain a guilty verdict. *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011); *State v. Banks*, 271 S.W.3d 90, 137-38 (Tenn. 2008). In conducting this analysis, "we must afford the State the strongest legitimate

view of the evidence and any reasonable inferences that may be drawn from it." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010); *see also State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009).

With these standards in mind, we turn to this defendant's particular claim.

The defendant does not challenge the fact that the victim testified at trial in a manner that supports the jury's findings with respect to each of the elements of his offenses. Rather, the defendant merely challenges the victim's credibility. The defendant urges that because the victim: (1) temporarily recanted her initial allegations (made to her mother) of rape and assault at the hands of the defendant before the defendant's arrest, (2) did not tell her mother that she had been touched by the defendant on numerous occasions despite having the opportunity to do so, and (3) did not characterize these incidents as "rape" when she described them to her sister, "she is less credible and therefore, less weight should be given her testimony." However, this court does not re-weigh evidence on appeal. "Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact." *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011). Merely alleging that a key witness's testimony is not credible or was accorded too much weight by the trier of fact does not suffice to raise a challenge to the sufficiency of the evidence and affords this court no basis for granting relief.

**II.**

The defendant claims that the prosecution committed misconduct in closing arguments by deliberately making inflammatory remarks. The remarks at issue were made in the context discussing one particular piece of evidence, the burnt pregnancy test. The victim testified that the defendant made her take the pregnancy test after he became scared that she might be pregnant, and then burned and buried the pregnancy test afterward while she watched. The defendant urges that the prosecutor committed misconduct by arguing that the defendant did so in order to send a message to the victim that he could burn and bury her in the same way, claiming that there was no evidence concerning the defendant's intent or pertaining to why the pregnancy test was burned. The transcript of the prosecutor's argument reads, in pertinent part:

A thirteen year old child, having to sit on the toilet in front of her stepdad, with her legs spread out, peeing on a pregnancy test to see if she's pregnant.

Can you imagine what's going through that child's brain at that particular point in time?

I mean she herself thinking, am I pregnant, am I about to be a mother and have to take care of a baby when I'm a baby myself? With him who had just raped her standing over her?

She drops it, he smacks her across the face and says here, I'm going to get another one and you're going to take another one. Puts her through that same embarrassment, through that same process and then takes her out to the tackroom, burns it in front of her and then buries it. I submit to you he's telling her, hey, this is what I did to this pregnancy test, you remember that, I buried this pregnancy test, I can bury you just as well if you tell about it.

The defendant did not make any contemporaneous objection to this argument. Consequently, as the defendant acknowledges, his claim of prosecutorial misconduct has been waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Nonetheless, the defendant argues that he should be granted relief on the grounds that the prosecutorial conduct at issue constituted plain error. This court is empowered by rules of evidence and procedure to take notice of any "plain error" committed in the court below, notwithstanding a party's failure to object. *See, e.g., State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) ("Rule of Appellate Procedure 36(b), Rule of Evidence 103(d), and Rule of Criminal Procedure 52(b) allow this Court to take notice of 'plain errors' that were not raised in the proceedings below."). To be entitled to relief under a plain error standard, five factors must be established: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice." *Id.* (internal quotations omitted). This court need not consider all of the factors when it is clear from the record that one of the factors cannot be established. *See id.* "In addition, the plain error must have been of such a great magnitude that it probably changed the outcome of the trial." *Id.* (internal quotations omitted).

In this case, the defendant has not established that a clear and unequivocal rule of law has been breached. The trial court found that the prosecutor's argument concerning the pregnancy test was "reasonable and supported by the evidence." The trial court reasoned that there was considerable evidence that the defendant was upset while he forced the victim to take the pregnancy test, and there was considerable testimony that the victim was afraid of the defendant. While there was no direct evidence concerning the defendant's intent with

respect to burning and burying the test, the trial court ultimately agreed with the State that the argument that the defendant burned and buried the test in order to threaten and send a message to the victim was a reasonable inference that could be drawn from the evidence. We do not disagree with this assessment, and consequently we hold that no plain error was committed by the prosecutor during closing argument.

## III.

Finally, the defendant claims that the trial court erred by ordering him to serve his sentence on a single rape count consecutive to his remaining concurrent sentences. A defendant challenging his sentence bears the burden of demonstrating that the sentence is erroneous. *See State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). This court reviews issues concerning the length and manner of a defendant's sentence *de novo*, with a presumption that any factual determinations made by the trial court are correct. *Id.* This presumption "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *Id.* at 344-45 (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails" and we review the defendant's sentence under a plain *de novo* standard. *Id.* at 345.

The decision of whether to impose consecutive sentences "is a matter addressed to the sound discretion of the trial court." *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). A court may order consecutive sentences if it finds by a preponderance of evidence that, *inter alia*, "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." T. C. A. § 40-35-115(5) (2009). However, consecutive sentencing is subject to the general sentencing principles that the defendant's overall sentence not be "greater than that deserved for the offense committed" and be "justly deserved in relation to the seriousness of the offense." T.C.A. §§ 40-35-102(1), -103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

The defendant asserts that "the sentence of 20 years is not justified by the proof in the case." The defendant urges that his presentence report showed that he had no prior convictions and that he was in the low risk range concerning re-offense and violence. He argues that his overall sentence is not necessary to protect the public from further harm. However, we conclude that the trial court did not err by imposing consecutive sentences. The defendant was found guilty of multiple counts of rape and sexual battery that occurred

on multiple occasions. The defendant stood in a position of presumptive trust with respect to the victim. The defendant's sexual crimes included penetration of the victim's vagina with his penis. There is evidence in the record that the victim was afraid of the defendant. These facts suffice to support the judge's imposition of consecutive sentences pursuant to section 40-35-115(5); that factor does not require any showing that the defendant is likely to re-offend or poses a continuing danger to the public.

We agree with the trial court that a twenty year effective sentence is justly deserved in light of the seriousness of the defendant's offenses. Evidence in the record reflects that the victim required mental health treatment as a result of the defendant's crimes. The victim's mother testified that the family had been forced to move repeatedly as a result of the incident and that the victim's personality had become withdrawn since the abuse. These considerations suffice to support the sentence imposed. The defendant's claim that the trial court erred by imposing consecutive sentences, on this record, is denied.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE